AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   2:24-mj-00705-DUTY |
| MARK ADAM VALENCIA and | ) | |
| HECTOR ALEXANDER GALVEZ, | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

**FILED**
CLERK, U.S. DISTRICT COURT

2/7/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ____clee____ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____February 5, 2024_____ in the county of _____Los Angeles_____ in the
_____Central_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2(a) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Caleb D. Hodgson, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____February 7, 2024_____

_____
*Judge's signature*

City and state: _____Los Angeles, California_____

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Caleb D. Hodgson, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint against Mark Adam VALENCIA ("VALENCIA") and Hector Alexander GALVEZ ("GALVEZ") for a violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2(a) (possession with intent to distribute fentanyl) on or about February 5, 2024, within the Central District of California.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), each of which is in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A:

a.    An iPhone with telephone number 310-717-9358, seized from a black Toyota Camry bearing California license plate 8VAB470 (the "black Camry") on February 5, 2024, and believed to belong to GALVEZ ("SUBJECT DEVICE 1");

b.    A gray iPhone seized from the black Camry on February 5, 2024 ("SUBJECT DEVICE 2");

c.    A pink iPhone seized from the black Camry on February 5, 2024 ("SUBJECT DEVICE 3"); and

d.    A black iPhone seized from the black Camry on February 5, 2024 ("SUBJECT DEVICE 4").

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), and 18 U.S.C. § 924(c)(1)(A) (possession of a firearm during and in relation to a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent ("SA") with the DEA.  I have held this position since October 2019.  I am currently assigned to Los Angeles Field Division Enforcement Group 1.  I have completed DEA Basic Agent Training, an 18-week intensive training program at the DEA Training Academy in Quantico, Virginia, during which I received over 300 hours of comprehensive, formalized instruction in such matters as drug

identification; drug trafficking and interdiction; surveillance; criminal law; money laundering techniques; and asset identification, seizure and forfeiture, among other subjects.

6.    Prior to working for the DEA, I was employed as a criminal intelligence analyst for the Kentucky Intelligence Fusion Center, under the Kentucky Office of Homeland Security, specializing in organized crime intelligence collection and analysis.  I held this position for just under two years before joining DEA.

7.    Through my work at DEA, I have also conferred and interacted with experienced special agents, federal DEA Task Force Officers ("TFOs"), and local law enforcement investigators regarding the investigation of drug-trafficking offenses. During my tenure at DEA, I have been involved in investigations regarding (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs, (2) the laundering of drug proceeds and monetary instruments derived from narcotics activities, and (3) conspiracies associated with drug offenses. My involvement in these investigations has included debriefing defendants, witnesses, and confidential sources; conducting physical and electronic surveillance; assisting in court-authorized interceptions; executing search and arrest warrants; seizing drugs and drug-related assets; making arrests for narcotics-related offenses; and analyzing documents and records related to drug-trafficking activities and money laundering.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.     On February 5, 2024, a DEA Confidential Source (the "CS") coordinated a purchase of 10,000 fentanyl pills with an individual later determined to be GALVEZ.  Specifically, the CS communicated with GALVEZ at the phone number 310-717-9358 (i.e., SUBJECT DEVICE 2), which GALVEZ later admitted was his number. Prior to the planned transaction, an individual later determined to be VALENCIA picked up GALVEZ and drove GALVEZ to meet the CS to complete the transaction.  Following a traffic stop on VALENCIA's vehicle at the location where the CS told GALVEZ to meet, law enforcement found approximately 600 grams of fentanyl pills under the driver's seat where VALENCIA was sitting, and a loaded, stolen firearm under the car's radio near the driver's seat.  Law enforcement also found a loaded firearm in the backseat in between GALVEZ and another passenger.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.     Based on my review of law enforcement reports, conversations with other law enforcement agents, my conversations with the CS, and my own knowledge of the investigation, I am aware of the following:

**A.     DEA Special Agents Identify GALVEZ After an Interview with a DEA Confidential Source**

10.    On or about October 30, 2023, I spoke with the CS,[1] who told me about a drug trafficker who uses the number 310-717-9358

---

[1] The CS is cooperating with law enforcement in the hopes of obtaining a more favorable sentence relating to pending federal narcotics trafficking charges.  During the CS's cooperation with law enforcement, the information s/he has provided to law enforcement has been corroborated and proven to be reliable and accurate.

(the "-9358 number").  Specifically, during the interview, the
CS stated that the -9358 number was used by an individual that
the CS had met in the Hollywood, California area on previous
trips to Los Angeles, California, and goes by "Alexander" or
"Alejandro".

11.  The CS stated that s/he can obtain from this
individual "bricks" and/or "waters", which, based on my training
and experience, I believe to be drug slang for cocaine and/or
methamphetamine.

12.  After the call, using additional information provided
to me from the CS handlers, I identified the individual that I
believe uses the -9358 number as Hector Alexander GALVEZ based
on the following:

a.    The CS handlers provided a public Instagram
account with handle @ovoalexander and the -9358 number as being
associated with the "Alexander" or "Alejandro" as described by
the CS.  I queried law enforcement databases and found that
GALVEZ is associated with the -9358 number at 701 Gramercy Dr.
Apt 118, Los Angeles, California 90005.  Using GALVEZ's name and
date of birth, which is October xx, 1995, I was able to find
GALVEZ's California driver's license information[2], and compare it
to the @ovoalexander Instagram account.  I believe that the
person in GALVEZ's California driver's license photo is the same

---

[2] GALVEZ's California driver's license number is xxxx6278,
which matches the driver's license number provided in his
criminal history.  The date of birth October xx, 1995, is also
reflected on both.

person featured in posts made on the @ovoalexander Instagram account.

      b.   On February 2, 2024, I received subscriber information for the -9358 number.  The phone records list the user as More Money Management with an address at 677 Santa Clara Ave. Apt. 15, Venice, California 90291.  GALVEZ's driver's license lists that same address and law enforcement database queries also show that the address is associated with GALVEZ.

      c.   The @ovoalexander Instagram account listed a business called "Flawless Living LLC", which I queried in the California Secretary of State database.  I found a corporation called "flawless living" that was filed on June 4, 2022, by "Hector a Galvez" at "701 S Gramercy Dr. 118 Los Angeles, CA 90005", i.e., the same address associated with the -9358 number as described above.  This business filing document was signed on June 4, 2022, by "hector galvez".

      d.   Moreover, as described below, during a recorded, Mirandized interview, GALVEZ admitted the -9358 number belonged to him.

      **B.**    **The CS Messages GALVEZ Number About Purchasing Methamphetamine and Cocaine in October 2023**

13.   Based on my conversations with other law enforcement agents and my review of reports, I know that on October 30, 2023, at approximately 2:30 p.m., the CS called the -9358 number using the Signal application and spoke with an individual that I believe is GALVEZ.  The CS and GALVEZ spoke in English.  During this recorded telephone call, the CS asked GALVEZ if GALVEZ had

the "numbers" for "waters" and the "ticket on bricks". Based on my training and experience, and my conversation with the CS, I know that the CS was referring to methamphetamine when the CS used the term "waters" and was referring to cocaine when the CS used the term "bricks". GALVEZ said he would try to beat the price of "thirteen five" with reference to the "bricks" and that "the waters would be ready" for the CS. Based on my training and experience, and my conversation with the CS, I believe that "thirteen five" is a reference to a price of $13,500 for a kilogram of cocaine.[3]

**C.    The CS Messages GALVEZ About Purchasing Fentanyl and Methamphetamine in January 2024**

14.    Based on my conversations with other law enforcement agents, my review of reports, and my conversations with the CS, I know that:

a.    On January 29, 2024, the CS messaged the @ovoalexander account on Instagram direct message and asked the user of the @ovoalexander account (believed to be GALVEZ) if they could "link" while the CS is visiting in Los Angeles. The CS said s/he "Need like 80" followed by a water emoji. Based on my training and experience, and my conversation with the CS, I know that the CS was referring to methamphetamine when the CS used the water emoji.

b.    On January 31, 2024, at approximately 11:13 a.m., the CS messaged the -9358 number using the Signal application

---

[3] Based on my involvement in the investigation, I know that the CS did not end up purchasing narcotics from GALVEZ in October 2023 because GALVEZ was out of state when the CS was available to conduct the deal.

and asked "What # you have on blu" followed by "2 boats".  At approximately 11:30 a.m., the CS sent another message, asking "And what # on water".  Based on my training and experience, and my conversation with the CS, I know that the CS was referring to counterfeit oxycodone pills that likely contain fentanyl by using the term "blu".  Based on my training and experience, and my conversation with the CS, I know that the CS was asking for prices on the pills and the methamphetamine.  In response, the user of the -9358 number messaged the CS to discuss logistics of the transaction.

      c.  On February 1, 2024, I received a photo from the CS that showed that the Signal contact with whom he/she was communicating with had the name "Alex LA" and listed the -9358 Number as the phone number.

**D.  The CS Sets up a Fentanyl Transaction with GALVEZ for February 5, 2024**

15.  Based on my conversations with other law enforcement agents, my review of reports and text messages between GALVEZ and the CS, and my conversations with the CS, I know that:

      a.  On February 5, 2024, the CS messaged GALVEZ at the -9358 number using the Signal application to set up a drug transaction for later that day.  Below are excerpts from the conversation with timestamps:

        **CS:** "Yooo" – 8:58 a.m.

        **CS:** "Got Me Today?" – 8:58 a.m.

        **CS:** "Lmk if your people are for sure if not ima just grab what I can from my boy" – 1:48 p.m.

**CS:** "Most I can pay on blues is $1" – 1:48 p.m.

b.    Based on my training and experience, and my conversations with the CS, I know that the CS was referring to counterfeit oxycodone pills that likely contain fentanyl by using the term "blues" in his/her messages to GALVEZ.

c.    Over the next few hours, the CS messaged and called GALVEZ at the -9358 number to discuss setting up the drug transaction for later that evening.  For example, during one recorded call, GALVEZ mentioned to the CS that GALVEZ and a man from "Woodland Hills" could meet up with the CS downtown later that day.  Based on the context of the phone call, the surrounding messages, my knowledge of the investigation, and my training and experience, I believe that the GALVEZ was referencing a co-conspirator from Woodland Hills who would join the drug transaction that evening with GALVEZ and the CS.

d.    Later that afternoon, the CS messaged GALVEZ at the -9358 number that the CS could go "double on the blues."  In response, GALVEZ responded: "10 boats then?"  Based on my training and experience, and my conversations with the CS, I know that the CS was referring to counterfeit oxycodone pills that likely contain fentanyl by using the term "blues".  Additionally, based on my training and experience and the context of the above conversation, I know that the term "boats" likely refers to a quantity of approximately 1,000 pills.  Therefore, in this case, "10 boats" would be approximately 10,000 fentanyl pills.

e.    The CS and GALVEZ (using the -9358 number) then coordinated where and when to meet up for the transaction.  At approximately 7:14 p.m., the CS wrote to GALVEZ: "Gucci?"  Based on my training and experience, I believe that the CS was asking GALVEZ whether the deal was good to go forward.  In response, GALVEZ messaged the CS: "He's on his way already".  Based on context and the recorded call described above about the man from Woodland Hills, I believe that GALVEZ was referencing that the man from Woodland Hills was coming to pick up GALVEZ to meet the CS for the deal.

f.    At approximately 7:38, GALVEZ (using the -9358 number) told the CS "19 eta," which I believe, based on context, meant that GALVEZ was 19 minutes away.  In response, the CS messaged back that "Aight well as soon as he swoops you lmk bro" which I believe was a reference to the man from Woodland Hills.

g.    At approximately 7:52 p.m., the CS asked GALVEZ at the -9358 number how far GALVEZ was from "420 broadway st Santa Monica."  In response, GALVEZ sent an Apple Maps screenshot.  Based on my review of the screenshot, I know that GALVEZ's location on the Apple Maps screenshot showed that GALVEZ was approximately 11 minutes away from the 420 Broadway address.  Moreover, based on my familiarity with Apple Maps, I know that the blue dot on the screenshot represented GALVEZ's current location.  Based on the approximate location of the blue dot, I determined that GALVEZ was in the vicinity of 677 Santa Clara Ave., Venice, California 90291, i.e., the address listed on GALVEZ's driver's license.

h.   At approximately 7:54 p.m., the CS asked GALVEZ at the -9358 number, "OK come here that ku."  At approximately 8:00 p.m., GALVEZ responded: "On our way", "He just got me." Then, at approximately 8:16 p.m., GALVEZ messaged "Pulling up."

i.   Based on my involvement in the investigation, my conversations with the CS, and my review of recorded calls, I know that the CS then directed GALVEZ to meet him at a different location, specifically the La Conde restaurant in Santa Monica. At approximately 8:36 p.m., GALVEZ (using the -9358 number) sent the CS another Apple Maps screenshot showing that GALVEZ was at the La Conde restaurant in Santa Monica.  A minute later, GALVEZ messaged the CS: "Black Camry".

**E.   Law Enforcement Stop and Arrest VALENCIA, GALVEZ, And Individuals 1 and 2**

16.   Based on my conversations with other law enforcement agents, my review of reports, and my involvement in the investigation, I know that:

a.   At approximately 8:40 p.m., at the direction of DEA agents participating in the above-described investigation, Santa Monica Police Department ("SMPD") Officers Herrera and Duncan initiated a traffic stop on a black Toyota Camry with California license plate 8VAB470 in the vicinity of the La Conde restaurant.[4]  According to the SMPD report of the incident, one basis for the traffic stop was because the officers believed

---

[4] Based on my review of messages between GALVEZ and the CS, I know that GALVEZ messaged the CS at 8:48 p.m. that "Cops pulled us over."

that the tint on the front windshield of the car violated
California Vehicle Code Section 26708(a)(1).

      b.    SMPD officers then determined that the car was
registered to Mark VALENCIA in Woodland Hills, California.

      c.    There were four individuals inside the car: in
the driver's seat was an individual later determined to be
VALENCIA; in the front passenger seat was an individual later
determined to be Individual 1, VALENCIA's girlfriend; in the
driver's side rear seat was Individual 2; and in the passenger's
side rear seat was GALVEZ.

      d.    After he approached the passenger's side of the
car, Officer Duncan saw in plain view the handle of a firearm in
the empty compartment located just under the radio of the
vehicle.  He then saw a trigger guard in plain view, which led
him to believe that the object he saw was in fact a firearm.
Around the same time, Officer Weese saw in plain view a second
firearm in the backseat in between GALVEZ and Individual 2.

      e.    Officers later determined that the firearm under
the radio was a Smith & Wesson semi-automatic 9mm handgun.  The
firearm's magazine was loaded with six rounds of ammunition.
Moreover, based on officers' query of a database, the firearm
was reported stolen.  The firearm found in the backseat was an
FN Herstal 5.7 x 28 caliber firearm with a 20-round magazine.
The firearm had 11 rounds of ammunition loaded in the magazine
and one round of ammunition in the chamber.

      f.    SMPD then removed all four individuals from the
vehicle.  Based on the information known to the DEA about GALVEZ

and the CS's conversations about a fentanyl transaction that
evening, DEA agents then directed Los Angeles Police Department
("LAPD") K-9 Officer Seibert and his partner K-9 Casey to assist
with a search of VALENCIA's car.  K-9 Casey alerted to Officer
Seibert that Casey detected narcotics somewhere near the front
driver's seat.  Soon after, Officer Duncan looked under the
driver's seat of VALENCIA's car and saw a clear, Ziploc bag,
containing a large amount of small blue pills, consistent with
counterfeit oxycodone pills that contain fentanyl.

       g.    Around the same time, SMPD Officer Kim conducted
a consensual search of Individual 2 and found on his person a
clear baggie containing a white powdery substance, which
officers believed to be cocaine.

    17.  Officers also found four cell phones in the car:
SUBJECT DEVICE 1 was in the front of the car and plugged into
the car's aux port; SUBJECT DEVICES 2 and 3 were in the front
passenger seat; and SUBJECT DEVICE 4 was in the back passenger
seat.

    18.  At the scene, I called the -9358 number and saw
SUBJECT DEVICE 1 ringing with my phone number appearing on the
screen as the caller.  Therefore, I believe SUBJECT DEVICE 1
belongs to GALVEZ.

    19.  All four individuals were arrested and transported to
the Santa Monica jail.  During a recorded, Mirandized interview,
GALVEZ admitted that the -9358 number belonged to him.  During a
separate recorded, Mirandized interview, Individual 2 admitted
to possessing the firearm recovered in the backseat.  During

another separate recorded, <u>Mirandized</u> interview, Individual 1 confirmed that VALENCIA was her boyfriend.

**F.    The Blue Pills Test Presumptive Positive for Fentanyl**

20.    On February 6, 2024, I took possession of the suspected fentanyl pills from SMPD and transported them to the DEA office in downtown Los Angeles.  A field test of one of the pills tested positive for fentanyl.  After placing the pills in DEA evidence bags, the pills weighed approximately 610 gross grams.

**G.    All Four Passengers Have Multiple Felony Arrests**

21.    Based on my review of the SMPD police report and my review of criminal history records, I know the following criminal histories of VALENCIA, GALVEZ, and Individuals 1 and 2:

a.    VALENCIA has seven prior felony arrests including, but not limited to, Possession of an Assault Rifle, Possession of a Large Magazine, and Possession of a Concealed Firearm in Vehicle.

b.    GALVEZ has six prior felony arrests including, but not limited to, Domestic Violence, False Imprisonment, and Grand Theft.  GALVEZ is also on felony probation for Assault. Based on my review of GALVEZ's criminal history report in Arizona, I know that he was also was arrested in Arizona in November 2023 for Aggravated Assault with a Deadly Weapon.

c.    Individual 1 has a prior arrest for murder and is out on bond.

d.    Individual 2 has four prior felony arrests (all juvenile arrests) including, but not limited to, First Degree Robbery and Assault with a Deadly Weapon Involving a Firearm.

### V.    <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

22.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

       e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

23.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

       a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

16

individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

24.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

d.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

e.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

18

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

f.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

g.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

　　　　b.　Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.　Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.　CONCLUSION

28.　For all of the reasons described above, there is probable cause to believe that VALENCIA and GALVEZ committed a violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2(a) (possession with intent to distribute fentanyl) on or about February 5, 2024, within the Central District of California.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

```
                              /s/
```
_____
Caleb D. Hodgson,
DEA Special Agent


Subscribed to and sworn before me
this 7th day of February, 2024.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE